UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

UNITED STATES OF AMERICA,    .   CASE NO. 3:23-CR-029-22
                       .
        PLAINTIFF,    .
                       .
       V.           .   GALVESTON, TEXAS
                       .   WEDNESDAY, APRIL 3, 2024
GERARDO VILLARREAL-MARTINEZ, .   11:03 A.M. TO 12:35 P.M.
                       .
        DEFENDANT.    .
. . . . . . . . . . . . . . . .


DETENTION HEARING

SOME PARTIES APPEARING VIA ZOOM

BEFORE THE HONORABLE ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:              SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: ANTONIO B. BANDA

CASE MANAGER:            RUBEN CASTRO

OFFICIAL INTERPETER:     RAMON DEL VILLAR


TRANSCRIPTION SERVICE BY:

**TRINITY TRANSCRIPTION SERVICES**
**1081 Main Street**
**Surgoinsville, TN 37873**
**281-782-0802**


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 3:23-CR-029-29 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | GALVESTON, TEXAS |
| | . | WEDNESDAY, APRIL 3, 2024 |
| PATSAMONG SOMKONGMANY, | . | 11:03 A.M. TO 12:35 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 3:23-CR-029-22 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | |
| | . | |
| GERARDO VILLARREAL-MARTINEZ, | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .


DETENTION HEARING

SOME PARTIES APPEARING VIA ZOOM

BEFORE THE HONORABLE ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

Appearances:

**For the GOVERNMENT:**              **KENNETH A. CUSICK, ESQ.**
                                Assistant United States Attorney
                                Office of the United States
                                  Attorney
                                601 25TH Street, Room 227
                                Galveston, TX 77550

Appearances (cont.)

**DEFENDANT SOMKONGMANY:**     **ALEJANDRO MACIAS, ESQ.**
                              Law Office of Alejandro
                                Macias, P.C.
                              5300 Memorial Drive, Suite 1000
                              Houston, TX 77007


**DEFENDANT VILLARREAL-:**     **DAVID R. BIRES, ESQ.**
  **MARTINEZ:**                440 Louisiana Street, Suite 200
                              Houston, TX 77002


Transcription Service:        Cheryl L. Battaglia
                              Trinity Transcription Services
                              1081 Main Street
                              Surgoinsville, TN 37873

1    <u>**Galveston, Texas; Wednesday, April 3, 2024; 11:03 a.m.**</u>

2    **(Official Interpreter Present.)**

3        **THE COURT:** We have two cases. We're here this

4    morning.

5    **(Pause in the proceeding.)**

6        **THE COURT:** Sure, I set up.

7    **(Pause in the proceeding.)**

8        **THE COURT:** Okay. We have *United States versus*

9    *Gerardo Villarreal-Martinez, 3:23-CR-29-22,* and *United States*

10   *versus Patsamong Somkongmany, Case 3:23-CR-29-29.*

11       Who do we have for the Government?

12       **MR. CUSICK:** Kenneth Cusick for the United States for

13   both cases. Good morning, your Honor.

14       **THE COURT:** Hello, Mr. Cusick.

15       On behalf of the Defendants?

16       **MR. BIRES:** David Bires for Gerardo Villarreal.

17       **THE COURT:** Good to see you, Mr. Bires.

18       **MR. BIRES:** Good to see you, Judge.

19       **MR. MACIAS:** Alejandro Macias for Mr. Somkongmany.

20       **THE COURT:** Hello, Mr. Macias.

21       Hello, gentlemen.

22   **(Pause in the proceeding.)**

23       **THE COURT:** Okay. Are we ready to proceed with

24   detention hearing?

25       **MR. CUSICK:** Yes, your Honor.

1      **THE COURT:**  Okay.  If I could have the Defendants

2  have a seat at counsel table, please.

3      **(Pause in the proceeding.)**

4      **THE COURT:**  We do not have an interpreter.

5      **OFFICIAL INTERPRETER:**  We do, your Honor.  I believe

6  I'm here for a witness.

7      **THE COURT:**  Oh, okay.  Gotcha.

8      **OFFICIAL INTERPRETER:**  On Villarreal case.

9      **THE COURT:**  To be clear, I know you're the

10  interpreter.  I didn't see you talking into anything.  So I

11  was -- I meant -- it was poorly worded.  I meant to say we have

12  an interpreter who's not interpreting, but you can interpret

13  for a witness.  Terrific.

14      **MR. CUSICK:**  Right.

15      **THE COURT:**  And have you got that all set up?

16      **OFFICIAL INTERPRETER:**  Yes, I do.

17      **(Pause in the proceeding.)**

18      **THE COURT:**  As you all know, the way I like to do the

19  detention hearings is have the Government provide a proffer of

20  what the testimony will be.

21      **(Pause in the proceeding.)**

22      **THE COURT:**  It's safe to assume that it's going to be

23  Mr. Emerson, Agent Jay Emerson, who's going to be -- James

24  Emerson, who's the witness.

25      **MR. CUSICK:**  Yes, your Honor.

1          **THE COURT:**  And then we'll hear the proffer from

2    Mr. Cusick.

3          Obviously, Agent Emerson, if you would listen

4    closely, if the proffer is true, correct, and accurate in all

5    respects, then let us know.  And then I'll swear you in at that

6    time.  And then I'll turn it over to Mr. Bires and Mr. Macias

7    for full and complete cross examination.

8          With all that said, the floor is yours, Mr. Cusick.

9          **MR. CUSICK:**  Your Honor, do you want me to do both

10   proffers at one time?  Or are we going to do the Defendants

11   separately?

12       **(Pause in the proceeding.)**

13         **THE COURT:**  I'm happy to do whatever's the most

14   efficient.  What do -- have you -- what do you all think?  I

15   just don't know who different the situation and circumstances

16   about the Defendants.

17         **MR. CUSICK:**  Your Honor, they're not -- the

18   transactions, their involved with do not overlap.  They're not

19   involved simultaneously or anything like that.  They're going

20   to be separate events that we'll be talking about.

21         **THE COURT:**  I defer to Mr. Bires and Mr. Macias.  How

22   do you?

23         **MR. BIRES:**  I -- I would like to keep them separated

24   as much as possible.

25         **MR. MACIAS:**  Your Honor, if they're not related

1  transactions, I -- I would agree.

2      **THE COURT:**  Okay.  So why don't I do this.  If it's

3  okay.  I'll do one detention first.  And then apologize to

4  whoever's going to wait, but will then wait.

5      Now, who wants to go first?

6      **MR. MACIAS:**  I'll defer to Mr. Bires.

7      **THE COURT:**  Okay.  So let -- let's do this then.  We

8  will have -- we'll -- we'll start with the detention hearing

9  for Gerardo Villarreal-Martinez.  We'll do that in full and

10  complete.  And then we will move to the detention hearing for

11  Mr. Somkongmany.

12      Let me say, before we do go forward.  Exhibit 1 to

13  this hearing is going to be the Pretrial Report, which I have

14  reviewed thoroughly before here today.

15      Okay.  Now, Mr. Cusick --

16      **MR. CUSICK:**  Yes, your Honor.

17      **THE COURT:**  -- the floor's yours.

18      **MR. CUSICK:**  Your Honor, on the -- the case of

19  Gerardo Villarreal-Martinez, Mr. Martinez, Defendant Number 22,

20  and in this indictment --

21      **(Pause in the proceeding.)**

22      **MR. CUSICK:**  -- on behalf of DEA Task Force Officer

23  James Emmerson, who's available to testify.  The proffer would

24  consist of the fact that he was a case agent in this case.  He

25  investigated this case between, basically, 2019 to the present.

1      That there are numerous charges against this

2  Defendant.

3      **(Pause in the proceeding.)**

4      **MR. CUSICK:**  He -- he's named in the conspiracy and

5  money laundering conspiracy counts, as well as another 11 or 12

6  subsequent counts.

7      Regarding Mr. Villarreal-Martinez' role in

8  this -- these offenses, the Government's opinion, the DEA's

9  opinion, and the investigation of the case agent, based on his

10  investigation is, Mr. Villarreal-Martinez is relatively high up

11  in the organization.  And the hierarchy as -- as alleged in the

12  conspiracy.

13      He was a -- a distributor of -- of cocaine,

14  methamphetamine, fentanyl, heroin, as alleged in the

15  indictment.  And the way he participated was he directed the

16  activities of subordinates and worked to direct the delivery of

17  drugs and take delivery of money as payment for the drugs.

18      In particular, the -- the dealings of Mr. Villarreal-

19  Martinez involved the -- we had numerous -- the Government had

20  numerous court-authorized wire taps of his phones, which led to

21  discovery of some of the transactions and also seizures of some

22  of the drugs.

23      And on these intercepted calls, verified that Mr.

24  Villarreal-Martinez was conversing with sources of supply in

25  Mexico, who are strongly associated with, and parts of, the

1    Cartel Jalisco New Generation.

2           And on occasion, this Defendant conversed or had

3    contact with the head of that cartel in an effort to -- to

4    secure drugs to be then smuggled in -- into the United States

5    and sold.  And based on the observations and investigation of

6    the agent, he would testify that in particular there were

7    actually two seizures derived from this investigation.

8           Then in September of 2019, there was an active court-

9    authorized wiretap.  And that Mr. Villarreal-Martinez and

10   another person by the name of Cesar Alejandro Mora (phonetic)

11   provided eight kilograms -- obtained eight kilograms of cocaine

12   and provided it to a person by the name of Pete Molina

13   (phonetic).

14          The -- these activities were being monitored on the

15   wiretap.  Mr. Molina was then to transport this cocaine to a

16   Gregory Fontaine (phonetic) Jones --

17          **THE COURT:**  What day was this?

18          **MR. CUSICK:**  September 16th. 2019.

19       **(Pause in the proceeding.)**

20          **MR. CUSICK:**  The ultimate delivery of these drugs was

21   to a Mr. Jones in Pensacola, Florida.  Verification of what

22   they heard on the wire tap occurred on September the 18th, when

23   Baldwin County Sheriff's Office did a traffic stop with

24   Mr. Molina.  And during the -- the stop and a probable cause

25   search, discovered eight kilograms of cocaine in an aftermarket

1  compartment between the tail length -- tail lights of the

2  vehicle.

3  **(Pause in the proceeding.)**

4  **MR. CUSICK:**  Later on December the 7th, 2019, there

5  was another court-authorized wiretap of Mr. Villarreal, one of

6  his phones.  And during this period, it was discovered that

7  Oscar Manuel-Rodriguez delivered $120,000 to Mr. Villarreal-

8  Martinez, which was the proceeds from the sale of 5 kilograms

9  of cocaine.

10      And it was discovered during the investigation, based

11  on this wiretap and surveillance that all -- the five kilograms

12  of cocaine had gone to Manuel Castillo-Reyes (phonetic) in

13  Humble, Texas.

14      And --

15  **(Pause in the proceeding.)**

16  **MR. CUSICK:**  -- that the cocaine was sent to

17  Mr. Castillo by a courier, Luis Garcia-Perez, and then Luis

18  Avalos-Alcantar collected the money from the sale of it in

19  Humble, Texas.

20      And the money, the $120,000, was then transported and

21  made its way back ultimately to the supplier of the -- the

22  drugs in Mexico.

23  **(Pause in the proceeding.)**

24  **MR. CUSICK:**  During these -- these transactions, the

25  drugs coming north going to Houston, then the money coming back

1    south, conversations intercepted of Mr. Villarreal-Martinez, he

2    directed the activities, the couriers, the stash house,

3    conversed with the -- the persons in Mexico.  And the

4    Government's view was the leader of this particular

5    transaction.  And directed the activities of all the others he

6    had contact with.

7         **(Pause in the proceeding.)**

8         **MR. CUSICK:**  During the -- at the end of that

9    December 10th, 2019 part of the transaction with moving of the

10   $120,000, the agents on surveillance had traveled to a stash

11   house where the drugs had gone, and spoke to the occupant

12   there, Luis Avalos-Alcantar.

13        And during a consensual search of that house,

14   discovered $166,380 in U.S. currency, of which they believe the

15   $120,000 payment for that cocaine was part of it.

16        In addition, there were 73 kilograms of cocaine

17   discovered in the stash house.

18        **(Pause in the proceeding.)**

19        **MR. CUSICK:**  Those are the most glaring examples.

20   But there's been activity throughout this conspiracy, which

21   this Defendant was involved with these two, in particular-

22   involved, seizures.

23        Based on that, the -- it would be the Government,

24   excuse me, Agent Emerson's opinion that this -- this Defendant

25   would be risk of flight if he were released on bond to -- in

1    that he could one, could evade authorities.  And also would

2    continue in drug trafficking efforts.

3          It's also the agent's opinion that he would be a risk

4    of flight, based on what the Government knows about

5    Mr. Villarreal, that he has family in Mexico.  Throughout the

6    investigation, was traveling back and forth between Houston and

7    the Rio Grande Valley in an effort -- in efforts to carry out

8    this drug distribution activity.

9          And it would -- and it's the agent's opinion that

10   this Defendant has sufficient contacts and wherewithal with the

11   other members of the cartel in Mexico that he could easily go

12   and hide there and would be supported in his efforts to evade

13   law enforcement authorities.

14        **(Pause in the proceeding.)**

15        **MR. CUSICK:**  Your Honor, as the final thing would be

16   the agent would testify that last Tuesday, March the 26th of

17   2024, when the arrest began or carried out for

18   this -- the -- the Defendants, as many of the Defendants as the

19   Government could catch so far in this case, at the residence of

20   Mr. Villarreal-Martinez, he had -- it was found there were 6

21   kilograms of cocaine, $60,000 in U.S. currency --

22        And back that up.  It was the basis for the search

23   was there was an arrest warrant for Mr. Villarreal, but there

24   was also a court-authorized search warrant for his residence.

25        And so the Government, again, that, I believe that

1 reinforces the risk of flight and dangerousness to the

2 community opinion of the agent, your Honor.

3           And I pass the witness.

4           **THE COURT:**  Okay.  Before we go there.  Agent

5 Emerson, do me a favor.  Raise your right hand.

6      **(Witness sworn.)**

7           **THE COURT:**  Okay.  You heard the proffer that was

8 made by Mr. Cusick.

9           **THE WITNESS:**  Do I go up to the stand or stay right

10 here, your Honor?

11      **(Pause in the proceeding.)**

12           **THE COURT:**  I'm so used to doing these by Zoom

13 that --

14           **THE WITNESS:**  I know.  That's my --

15           **THE COURT:**  Let's have you go up on the witness

16 stand.  You are in the courtroom.

17      **(Witness takes the stand.)**

18      **(Pause in the proceeding.)**

19           **THE COURT:**  Okay.  I can't remember where we are.

20           Do me a favor.  Let's do this.  Make sure we cover

21 all the basis.  Raise your right hand.

22      **(Witness sworn.)**

23           **THE COURT:**  Okay.  You heard the proffer that was

24 made by Mr. Cusick.  Do you accept that proffer as your

25 testimony here today under penalty of perjury and under oath?

1            **THE WITNESS:**  Yes, sir.  I do.

2            **THE COURT:**  Okay.  Mr. Bires, the floor is yours.

3            **MR. BIRES:**  Thank you, your Honor.  If I may, may I

4   have a copy of the notes that the prosecutor used to make his

5   proffer?

6            **THE COURT:**  Unless it's his hand-written notes, I

7   don't -- is there some formal written proffer you have there,

8   Mr. Cusick?

9            **MR. CUSICK:**  I have a -- a typed report that the

10  agent had prepared a summary for me, your Honor.

11           **THE COURT:**  Okay.  Fair enough.  Make sure that is

12  given to Mr. Bires.

13           **MR. BIRES:**  Thank you, Judge.

14       **(Pause in the proceeding.)**

15                          **CROSS EXAMINATION**

16  BY MR. BIRES:

17  Q    And Agent Emerson, were -- were you present at the arrest

18  of Gerardo Villarreal?

19  A    No, sir.

20  Q    And he was arrested pursuant to the issuance of

21  a -- a -- of an arrest warrant, right?

22  A    Correct.  Yes, sir.

23  Q    And it had your, I'm sorry -- I'm sorry.

24       **(Pause in the proceeding.)**

25           **THE COURT:**  I didn't say anything.

1          **MR. BIRES:**  Oh.

2     **BY MR. BIRES:**

3     Q    And who were the agents that were involved in his arrest?

4     A    We had HPD there and the U.S. Marshals.

5     Q    All right.  And did they have an actual arrest warrant for

6     Mr. Villarreal?

7     A    Yes, sir.  I provided it to them, and a search warrant.

8     Q    Okay.  And that was my next question.

9          Who issued the search warrant?

10    A    Judge Edison.

11    Q    Okay.  And when was that search warrant issued?

12    A    Maybe March 25th, I believe it was the Monday before.  And

13    then March 26th is when we executed the search warrant and the

14    arrest warrant.

15    Q    All right.

16         **(Pause in the proceeding.)**

17    **BY MR. BIRES:**

18    Q    And do you know the names of the -- the agents that were

19    involved in the execution of that search warrant?

20    A    I know the team leaders that were there.  I don't know all

21    the agents that were present.

22    Q    Okay.  And can you tell me who the team leaders were.

23    A    Alfredo Garza with Houston --

24    Q    With?

25    A    Alfredo Garza from Houston PD.  And Jay Carrera (phonetic)

1    from Houston PD.

2    Q    Okay.  Any federal agents with any federal agencies?

3    A    The Deputy U.S. Marshals.

4    Q    Okay.  So -- and you're with the Drug Enforcement

5    Administration, correct?

6    A    I'm with the Galveston Police Department.  But I'm

7    assigned to the DEA.

8    Q    All right.  So you're a task force officer --

9    A    Correct.

10   Q    -- for DEA.

11   A    Correct.  Yes, sir.

12   Q    And how long have you been assigned -- assigned to Drug

13   Enforcement Administration?

14   A    Over 14 years.

15   Q    So you were involved in the inception of this

16   investigation?

17   A    Yes, sir.  I'm the one that initiated the investigation.

18   And I'm the case agent for the investigation.

19   Q    All right.  Did -- did you know at the time that -- that

20   you started your investigation that Mr. Villarreal, excuse me,

21   that Mr. Villarreal was under investigation in McAllen,

22   Texas --

23   A    Yes, I --

24   Q    -- ATF?

25   A    Yes, sir.  I was very aware.

1    Q     Yeah.  And did you have an active Title 3 wire going on

2    during your investigation?

3    A     My investigation was prior to the ATF investigation in

4    McAllen.  And, yes, we had, I believe four wire -- court-

5    authorized wiretaps on Mr. Villarreal's phones.

6    Q     Okay.  And what periods of time were those wire taps?

7    A     In late 2019 and maybe it bled over into early 2020.  But

8    definitely near the end of 2019.

9    Q     All right.  And then do you -- you had four separate

10   wiretaps?

11   A     Yes, sir.  I'm -- I'm going off memory.  But I believe it

12   was initially two wiretaps on two of his phones simultaneously.

13   Q     Uh-huh.

14   A     Followed by two more wiretaps on two additional phones

15   that he had both simultaneously.

16         We were intercepting the phone calls from both

17   telephones that he was in Houston.

18   Q     And how many total intercepts did you have where you

19   intercepted communications that Mr. Villarreal was involved in?

20   A     That's impossible for me to give you a number going off

21   memory.  Over a hundred.

22         **(Pause in the proceeding.)**

23   Q     Well he was not the only target of these Title 3

24   intercepts, was he?

25   A     No.  There were other target intercepts that were listed

1  on the wiretaps.

2  Q    But with regards to -- so what I'm trying to get

3  you -- get you to do if you can, is narrow down for me, as best

4  you can, maybe it's a guesstimate, the total number of wire

5  intercepts in which Mr. Villarreal was a party to the call.

6  A    Okay.  Again, that being almost impossible.  There's 4

7  wiretaps over 30-day periods.  Like I said over 100, maybe over

8  200, maybe over 300.

9       **(Pause in the proceeding.)**

10 **BY MR. BIRES:**

11 Q    Each of these calls was recorded.

12 A    Correct.  Yes, sir.

13      **(Pause in the proceeding.)**

14 **BY MR. BIRES:**

15 Q    Now, the prosecutor --

16      **(Pause in the proceeding.)**

17 **BY MR. BIRES:**

18 Q    -- said in his proffer, that --

19      **(Pause in the proceeding.)**

20 **BY MR. BIRES:**

21 Q    -- some of the intercepts involved Mr. Villarreal

22 communicating with a source of supply from Mexico.  Is that

23 correct?

24 A    Correct.  Yes, sir.

25 Q    And -- and who was that person?

1    A    The person we intercepted the most for his source of

2    supply  Luis Garcia-Perez.  But his primary source of supply

3    was Etiel (phonetic) Palacios (phonetic) Garcia, La Playa

4    (phonetic).

5    Q    Yeah.  And who's he?

6    A    He is a pretty large, prominent drug trafficker with

7    direct ties to Mencho (phonetic) who is Jalisco New Generation

8    Cartel.

9    Q    Okay.  Well, when you say the pretty large drug trafficker

10   with ties to the Jalisco New Generation Cartel, I mean,

11   who's -- who's he tied in with?

12   A    With Mencho -- with Mencho and with Nemecio (phonetic)

13   Segura-Cervantes (phonetic) and Jaime Silva-Flores Habanero

14   (phonetic).  Both of those are leaders within the CJN.

15        **(Pause in the proceeding.)**

16   **BY MR. BIRES:**

17   Q    And so who is the primary person that Mr. Villarreal is

18   alleged to have communicated with in Mexico?

19   A    You have to narrow that.  Primary person he communicated

20   with?

21   Q    Who -- yes.  Who is the primary person that Mr. Villarreal

22   is alleged to have communicated with in Mexico, source of

23   supply.

24   A    With Etiel Palacios-Garcia, La Playa.

25   Q    Okay.  And -- and his role?  Who is he?

1   A    He is the source of supply in Mexico.  He's currently in

2   prison in Mexico right now.

3   Q    All right.  And when were those communications made?

4   A    The communications with La Playa were not intercepted over

5   the wiretap.

6   Q    Were not?

7   A    Correct.

8         **(Pause in the proceeding.)**

9   **BY MR. BIRES:**

10  Q    So how do you know he's communicating with him?

11  A    There is similarities that all calls where he discussed La

12  Playa as his source of supply.  One of the individuals that was

13  indicted in this investigation had cooperated.  And he also

14  confirmed La Playa was the source.

15        We had an idea that La Playa was based on his name

16  and the information we got from the wiretap.  This source had

17  confirmed the names, which was Etiel Palacios-Garcia.

18        And then I received the proffer report that

19  Mr. Villarreal did with the ATF in McAllen where he admitted

20  that La Playa, Etiel Palacios-Garcia, was his source of supply.

21        **(Pause in the proceeding.)**

22  **BY MR. BIRES:**

23  Q    And now the Government made reference of the fact that

24  Mr. Villarreal is currently on supervised release from a

25  firearms case in McAllen, right?

1   A    Yes, sir.  That ATF case for federal gun trafficking laws.

2   Q    And he was placed on supervised release on what, May the

3   10th --

4   A    Yes, sir, 2022.

5   Q    -- 2022.  And in each of the charges in this indictment,

6   that Mr. Villarreal is named in, they all transpired prior to

7   Mr. Villarreal being placed on supervised release, correct?

8   A    Correct.

9        **(Pause in the proceeding.)**

10  **BY MR. BIRES:**

11  Q    And in this indictment, Count One names 41 people.  It's

12  everybody that's charged in this case, right?

13  A    Yes, sir.

14  Q    Mr. Villarreal is, I mean, Gerardo Villarreal is number 22

15  in that indictment, correct?

16  A    Correct.  Yes, sir.

17  Q    Okay.

18       **(Pause in the proceeding.)**

19  **BY MR. BIRES:**

20  Q    In each of -- in -- in Count Number One, talks about --

21       **(Pause in the proceeding.)**

22  **BY MR. BIRES:**

23  Q    -- cocaine --

24       **(Pause in the proceeding.)**

25  //

1   **BY MR. BIRES:**

2   Q    -- fentanyl, heroin, and methamphetamine, right?

3   A    Yes, sir.

4   Q    In each of the substantive counts that Mr. Villarreal is

5   charged in the substance is cocaine.

6   A    Correct.

7   Q    He's not charged with methamphetamine, or for fentanyl, or

8   heroin in this indictment, right?

9   A    Incorrect.  He's charged in it under Count One.

10  Q    Well, Count One's global, multiple object conspiracy.

11  A    Right.

12  Q    But in terms of specific charges against Mr. Villarreal,

13  it's -- it's cocaine only, correct?

14  A    I don't understand your question.  He -- he is charged in

15  Count One, which includes drugs other cocaine.

16       If you're referring to the substantive counts,

17  correct.  Only the -- only the substantive counts that he's

18  charged in the indictment deals with cocaine.

19  Q    All right.  And that's what I was trying to get at.

20       The only substantive counts that he's charged with

21  in, in fact, deal with cocaine, not fentanyl, methamphetamine,

22  or heroin.

23  A    Correct.

24  Q    There are other people in the indictment that are charged

25  with those substances, correct?

1  A    Correct.  Forty other individuals.

2  Q    Okay.

3       **(Pause in the proceeding.)**

4       **THE COURT:**  Hold on.  I'm not sure I understand what

5  that means.  Well help -- help me understand.

6       Count One is a conspiracy involving, among other

7  things, cocaine, fentanyl, and heroin.

8       **THE WITNESS:**  Correct.  Yes, sir.

9       **THE COURT:**  So it's all those different --

10      **THE WITNESS:**  Those are all the drugs that are

11 encountered in the conspiracy, the drugs that were seized in

12 the conspiracy.

13      **THE COURT:**  Okay.  And then there are separate

14 charges specifically against this Defendant for --

15      **THE WITNESS:**  Cocaine.

16      **(Pause in the proceeding.)**

17      **THE COURT:**  Help me out, Mr. Bires.  I just want to

18 make sure I understand what you're asking.

19      **MR. BIRES:**  That the only substantive charges that

20 are lodged against Mr. Villarreal involve cocaine.  That he's

21 not charged substantively with fentanyl, methamphetamine, or

22 heroin.

23      **THE COURT:**  Okay.  Okay.  Got it.

24      But there's no disagreement on that.

25      **THE WITNESS:**  Correct.

1          **THE COURT:**  Okay.  Let me ask you a question just --

2          **(Pause in the proceeding.)**

3          **THE COURT:**  In the proffer, there was some discussion

4  about some calls on September 16th, 2019.

5          **THE WITNESS:**  Correct.

6          **THE COURT:**  What, if any, criminal involvement are

7  you aware of that the Defendant had after May 10th of 2022?

8          **THE WITNESS:**  The search warrant that was -- there's

9  a -- there's a couple.

10         There's an additional 30 kilograms of cocaine, 3 or 4

11  kilograms of cocaine that was seized in March, 2023, I'm sorry,

12  April of 2023.  Another 3 kilograms of cocaine that was in

13  March of 2024, prior to the -- the takedown.

14         And this was information from a confidential source

15  that provided information on vehicles that were utilized when

16  Mr. Villarreal was transporting cocaine.

17         And then finally, the execution of the search warrant

18  on March 26th of 2024, which led to the seizure of 6 kilograms

19  of cocaine and a little over $60,000.

20         **THE COURT:**  Okay.  Make sure I understand.

21         Putting aside -- I understand the -- the search

22  warrant on March 26th --

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  -- what that found.

25         The other -- the other instance, April, 2023 and

1    March, 2024, what's the allegation?  That Mr. Villarreal-

2    Martinez was transporting cocaine at that time?

3            **THE WITNESS:**  No, sir.  And he's not charged for

4    those -- those counts.

5            Those are just two transactions that, I believe he

6    was a part of.  The confidential source that speaks directly to

7    Mr. Villarreal had provided myself and other agents the

8    vehicles that Mr. Villarreal was using to transport cocaine

9    from the Rio Grande Valley.

10           **THE COURT:**  When you say the vehicles, he was

11   utilizing.  You don't mean he was driving them.  You mean he

12   was arranging --

13           **THE WITNESS:**  Correct.

14           **THE COURT:**  -- or providing for the transportation.

15           **THE WITNESS:**  Yes, sir.  Mr. Villarreal would, I

16   believe, never -- there was a few occasions where he would have

17   to drive it.  But for the most part he would always direct or

18   supervise coordinating the delivery with couriers that would

19   transport it themselves.

20           **THE COURT:**  Okay.  Sorry, Mr. Bires.  Go ahead.

21           **MR. BIRES:**  It's all right.

22   **BY MR. BIRES:**

23   Q    Well what occasion did he actually drive a load of

24   cocaine?

25   A    It's difficult to, you know, wasn't prepared to have to go

1  over the specific dates, cause there's a lot of counts he was

2  involved in.

3          But again, going off memory, there was one individual

4  that he would personally meet and transport the cocaine to,

5  which was a co-Defendant in this case, Michael Barajas.

6          With that individual, for unknown reasons, he would

7  actually transport the cocaine himself.  But for 90 percent of

8  everybody else, he would direct co-Defendants, Ovidio Martinez,

9  Manuel Castillo, directed them to deliver the cocaine to his

10 customers.

11     **(Pause in the proceeding.)**

12 **BY MR. BIRES:**

13 Q    So did you say Michael Barajas?

14 A    Yes.

15 Q    Okay.  And in -- in which count, that would be Count

16 Number Twenty-Seven; is that right?

17 A    I don't know off the top of my head.  I would need to see

18 the indictment.

19 Q    Do you have a copy of the indictment?

20 A    I don't have a copy up here with me -- with me.

21 Q    If I told you the Count Twenty-Seven charged Gerardo

22 Villarreal and Michael Ryan Barajas on September the 7th of

23 2019, does that sound --

24 A    Yes, sir.

25 Q    -- that's 2019.

1  A    I believe it was two kilograms of cocaine on that

2  transaction going off memory.

3  Q    Two kilograms of cocaine.

4  A    Yes.

5  Q    Is that right?

6       **(Pause in the proceeding.)**

7  **BY MR. BIRES:**

8  Q    And again, that's in September of 2019, correct?

9  A    Yes.

10      **(Pause in the proceeding.)**

11 **BY MR. BIRES:**

12 Q    And --

13      **(Pause in the proceeding.)**

14 **BY MR. BIRES:**

15 Q    Did you have any wire intercepts between Gerardo

16 Villarreal and Michael Ryan Barajas?

17 A    Yes, sir.  There were a lot of intercepted phone calls

18 between the two.  And there was physical surveillance also for

19 that transaction.

20 Q    And when was that wire intercept between Gerardo

21 Villarreal and Mr. Barajas?

22 A    September, 2019.  Unless you're asking the exact date.

23 Q    I'm just asking when.

24 A    September, 2019.

25      **(Pause in the proceeding.)**

1          **THE COURT:**  The house where he was arrested, was that

2     his house?

3              **THE WITNESS:**  Yes, sir.

4          It was -- he had -- an apartment that he had just

5     leased.  We had sent a subpoena to the -- the building

6     management and he provided us a copy of the lease.  It was

7     signed only in his name and his signature.

8          **(Pause in the proceeding.)**

9     **BY MR. BIRES:**

10    Q    In the information that you provided to Mr. Cusick, you

11    indicated that in the section that is referred to as Danger to

12    the Public, you stated in your written proffer, "No known

13    danger to the public aside from drug trafficking and firearms

14    trafficking."

15    A    Correct.

16    Q    No -- no known danger to the public, correct?

17    A    Correct.  No indication of violence or anything like --

18    Q    Okay.

19    A    -- that during the investigation.

20    Q    All right.

21         **(Pause in the proceeding.)**

22    **BY MR. BIRES:**

23    Q    And with regards to the September 16th and 18th --

24         **(Pause in the proceeding.)**

25    //

1    **BY MR. BIRES:**

2    Q    Your written proffer to Mr. Cusick talks about Cesar

3    Alejandro Mora, Pete Molina, Gregory Fontaine on September the

4    16th, right?

5    A    Yes.

6    Q    Doesn't mention Mr. Barajas, does it?

7    A    No, sir.

8    Q    And on September the 18th, it's Mr. Molina that gets

9    stopped on traffic, right?

10   A    Correct.

11       **(Pause in the proceeding.)**

12   **BY MR. BIRES:**

13   Q    In your written proffer, you talked about --

14       **(Pause in the proceeding.)**

15   **BY MR. BIRES:**

16   Q    -- a transaction that occurred around December the 7th of

17   2019.  And the persons that you allege were involved in that

18   are Gerardo Villarreal, Oscar Manuel Rodriguez, Manuel

19   Castillo-Reyes, and again, Michael Barajas is not mentioned

20   with regards to that particular alleged transaction, right?

21   A    Correct.  He was not involved in that transaction.

22   Michael Barajas was not --

23   Q    Got it.

24   A    -- involved in that transaction.

25       **(Pause in the proceeding.)**

1  **BY MR. BIRES:**

2  Q    You referred to a seizure of some money that occurred

3  on -- on or about December the 10th of 2019.  Agents went to

4  the home of Luis Garcia-Perez, right?  Or stash house.

5  A    Stash house.  It was Luis Avalos-Alcantar that was staying

6  there at the stash house.

7  Q    Okay.  And again, so Luis Garcia-Perez and Luis Avalos-

8  Alcantar were the people that were involved in the seizure of

9  the money at that location, correct?

10 A    They weren't the only people involved in that specific

11 seizure.

12 Q    They're the persons named in your written proffer,

13 correct?

14 A    Correct.  But I don't understand the question about who's

15 involved in the seizure.

16 Q    Well your -- your written proffer details specific

17 instances that were proffered by the Government to try to show

18 the evidence against Gerardo Villarreal.

19       But with regards to December the 10th of 2019 in your

20 written -- written proffer that you provided to Mr. Cusick, the

21 persons that were named were Luis Avalos-Alcantar and Luis

22 Garcia-Perez, right?

23 A    No, sir.

24       You're -- I believe you're reading the last

25 paragraph.  The paragraph right before that will name the other

1   individuals that were involved in it, which is Mr. Villarreal-

2   Martinez, and Oscar Rodriguez, and Manuel Castillo-Reyes.  That

3   would be the paragraph right before the -- the paragraph that

4   talks about the seizure.

5   Q    When you detailed the agents that went to Luis Garcia-

6   Perez' stash house, the person that they encountered

7   was -- encountered was Luis Avalos-Alcantar, correct?

8   A    Correct.  He was the only person at the stash house.

9   Q    Okay.  And that's where they seized $166,390, correct?

10  A    Yes, that is.  And --

11  Q    And --

12  A    -- 73 kilos.

13  Q    -- 73 kilos of cocaine.

14  A    Yes.

15  Q    Right?

16        **(Pause in the proceeding.)**

17          **MR. BIRES:**  Just one moment.

18        **(Pause in the proceeding.)**

19  **BY MR. BIRES:**

20  Q    What is the evidence that you have that connects

21  Gerardo -- that you say connects Gerardo Villarreal to Michael

22  Ryan Barajas?  You know, Villarreal and Barajas are named in

23  Count Twenty-seven, right?

24  A    Yes, sir.

25  Q    What -- what is the connection between Gerardo Villarreal

1  and Michael Ryan Barajas?

2  A     The connection is Mr. Villarreal-Martinez was the supplier

3  and Mr. Barajas was the client that would purchase the cocaine

4  and redistribute -- redistribute the cocaine to other buyers.

5          The evidence that have is court-authorized wiretaps

6  of Mr. Villarreal's cellular phones and also physical

7  surveillance.

8  Q     And what did this -- what did the physical surveillance

9  disclose?

10 A     Again, the -- this is multiple transactions.  If you're

11 asking specifics.

12 Q     Well I'm asking you about County Twenty-seven.

13 A     If that's the count that I recall.

14 Q     September 7th, 2019.

15 A     I -- I can't remember specific counts, so I can and reach

16 back -- back in the memory.

17         If I recall, Mr. Villarreal-Martinez, and again I'm

18 going straight off memory.  He had returned to his house

19 at -- or residence at the time, which is a high-rise condo in

20 the Galleria area.  He had returned from McAllen, Texas.

21         I can't remember who he was with.  I believe he was

22 with either Ovidio Martinez or Manuel Castillo.  Upon their

23 return, when they were driving back, we intercepted telephone

24 calls between Mr. Barajas and Mr. Villarreal.

25         Mr. Barajas had ordered two kilograms of cocaine.  If

1  I'm not mistaken, it was to be supplied to his uncle, Jesse

2  Barajas, based on the intercepted telephone calls.

3  Q    Hmmm.

4  A    We initiated surveillance at Mr. Villarreal's high-rise

5  condo in the Galleria.  We saw them arrive.  We continued

6  surveillance.  Once Mr. Villarreal left, he had another

7  individual that was with him.

8        He was driving -- he had a Ford Raptor at the time.

9  I -- I believe it was Ovidio Martinez that was riding in the

10  passenger seat with him.

11        They drove to Mr. Barajas' apartments, which were in

12  the Katy area, delivered the two kilograms of cocaine to him.

13  And, you know, here I can't remember if one of the kilograms

14  was bad and one of them was returned, or that was another

15  transaction.

16        But again, there -- it was all over wiretap

17  intercepted telephone calls and physical surveillance.

18  Q    Well you're qualifying your response so that you're

19  saying -- you -- you begin by saying you're going strictly off

20  memories.  So you're not really sure about the details of what

21  you're saying, correct?

22  A    Correct.  I wasn't prepared to have the exact details for

23  the -- the purpose of this detention hearing.

24  Q    Okay.

25        **(Pause in the proceeding.)**

1  **BY MR. BIRES:**

2  Q    Now your investigation began before the -- the case that

3  resulted in Mr. Villarreal being given a time served sentence

4  of 11 days and 3 years of supervised release down in McAllen,

5  right?  The ATF case.

6  A    Yes, sir.  My case was before their investigation.

7  Q    Okay.  And actually, that case in McAllen had to do with

8  another individual making a false statement on a 4473.

9  A    Yes, sir.  And that -- now just to clarify.

10        The previous transaction we talked about, that's who

11 was actually with him.  It was Rafael Montemayor-Deras when

12 they went to deliver those two kilograms of cocaine to

13 Mr. Barajas.

14 Q    Uh-huh.  And so, again, the prosecution in McAllen was

15 based upon Mr. Deras making false statements on an ATF form,

16 right?

17 A    I don't know the full details.  And again, I'm not

18 knowledgeable about gun trafficking laws on really just L21.

19 Q    Okay.  Well, I mean, you knew that investigation was going

20 on --

21 A    Correct.

22 Q    Right?

23 A    Yes.

24 Q    Because it kind of stepped in the middle of your

25 investigation, didn't it?

1    A     Yes.

2    Q     Kind of created some problems for your investigation,

3    right?

4    A     Yes.  Created a lot of problems.

5    Q     Yeah.  Right.

6         **(Pause in the proceeding.)**

7    **BY MR. BIRES:**

8    Q     And, all right.

9         **(Pause in the proceeding.)**

10   **BY MR. BIRES:**

11   Q     So with -- with regards to -- and I -- I referenced this a

12   little earlier.  And I don't want to try to guild the lily too

13   much here.

14         In your -- in your written proffer that you gave to

15   Mr. Cusick, which -- which he referred to earlier,

16   Mr. Villarreal is not a danger to the public, right?  He

17   doesn't have any history of violence, correct?

18   A     If you're referring to my written proffer, I put he

19   is -- there's no known danger to the public, aside from drug

20   trafficking and firearms trafficking.

21   Q     Just the -- the general drug traffic and firearm -- and

22   firearm --

23   A     Correct.

24   Q     -- trafficking.

25   A     No -- no known violence --

1   Q    Okay.

2   A    -- that I'm aware of.

3   Q    Right.  Okay.

4        **(Pause in the proceeding.)**

5            **MR. BIRES:**  One moment, your Honor.

6        **(Pause in the proceeding.)**

7   **BY MR. BIRES:**

8   Q    And while Mr. Villarreal has been on supervised release,

9   have -- have you had an opportunity, or are you aware of the

10  Pretrial Services Report in this case?

11  A    Yes.

12  Q    And you know that it reported that Mr. Villarreal has been

13  compliant with the conditions of his supervised release, right?

14  A    I -- I don't believe so.  I believe it talked about the

15  six-kilogram cocaine seizure while he was on supervised

16  release.

17  Q    Did -- did you read the -- the Supervised Release

18  Report --

19  A    No, sir.  I skimmed through it.

20  Q    -- Pretrial Services Report, in which Pretrial Services

21  reported that Mr. Villarreal had been compliant, right?

22  A    I'd have to see it.  I have to -- I have --

23  Q    Okay.

24  A    -- to look at it to give you the correct answer.

25       **(Pause in the proceeding.)**

1      **(Voices whispering.)**

2           **THE COURT:** I -- I don't think there's going to be a

3      dispute. I mean, I'll just read you what the Pretrial Report

4      says. I just saw that. I just read it. Where is it? What --

5           **(Pause in the proceeding.)**

6           **THE COURT:** "On 3/27/24, the McAllen

7                Division advised the Defendant has been

8                compliant throughout his term of supervised

9                release and recently paid off the fine

10               assessed in the above case."

11     That's all.

12          **MR. BIRES:** Right. I just wondered if this agent

13     knew that.

14          **THE WITNESS:** No, sir. I -- I wasn't aware that --

15     **BY MR. BIRES:**

16     Q    All right.

17     A    -- that --

18     Q    All right.

19     A    -- they didn't violate over the six kilograms.

20     Q    And -- and you have -- basically the thrust of your

21     testimony that he's a danger, right?

22     A    The biggest part is he's a flight risk.

23     Q    Okay. And --

24     A    And he --

25     Q    -- that he's a flight risk.

1    A    That's the --

2    Q    Okay.

3    A    That's the --

4    Q    So you're -- you --

5    A    -- primary.

6    Q    -- basically what you're saying, the -- the -- your major

7    concern is that he is a flight risk.

8    A    Yes.  I definitely believe he's a flight risk.

9    Q    Okay.  I mean, he's a United States citizen, correct?

10   A    Yes, sir.

11   Q    He resides in McAllen, Texas, right?  Was --

12   A    In Houston, Texas --

13   Q    -- residing --

14   A    -- and McAllen, Texas.  He has two --

15   Q    -- was residing --

16   A    -- two residences.

17   Q    -- in McAllen, Texas until about a month ago; is that

18   right?

19   A    Off and on.  He also -- he would normally have two

20   residences, one in Houston, one in McAllen.

21   Q    He was born in Pharr, Texas.

22   A    Yes, sir.

23   Q    He has lived most of his life in the McAllen area, right?

24   A    I don't know how long he's been.

25   Q    He has a mom that lives in Mexico and a sister that lives

1  in Mexico, right?

2  A    Yes, sir.

3       **(Pause in the proceeding.)**

4  **BY MR. BIRES:**

5  Q    You -- basically, the thrust of your testimony is, is

6  because of his connections and because of his familial

7  relationship that he's a flight risk.

8  A    That's not the only reason, but that's -- that's a big

9  reason.

10 Q    Okay.

11      **(Pause in the proceeding.)**

12 **BY MR. BIRES:**

13 Q    He has been on federal supervised release now for almost

14 exactly two years as of May the 10th.  So one year and 11

15 months.

16      **(Pause in the proceeding.)**

17 **BY MR. BIRES:**

18 Q    Right there in McAllen, Texas.  Back and forth.  Recently

19 went to see his mom in Mexico, right?

20 A    I don't know.  I don't know if he did.

21 Q    Okay.  Has never tried to flee.  Has never tried to flee.

22      **THE COURT:**  Well let -- let me ask.  When you say

23 recently.  According to the Pretrial Report, the last time it

24 was in May, 2020.  Is that what you're -- I just want to make

25 sure --

1        **MR. BIRES:**  Well, I guess that's --

2        **THE COURT:**  -- I'm not missing --

3        **MR. BIRES:**  -- what I'm referring to.

4        **THE COURT:**  Okay.  Fair enough.  Fair enough.

5        **MR. BIRES:**  May 2020.

6    **BY MR. BIRES:**

7    Q    But -- but he hasn't tried to flee since he was placed on

8    supervised release on May the 10th of 2022, right?

9    A    That I'm aware of, no.

10   Q    Well he's sitting right here behind me.

11   A    You said tried to flee, not that he did flee.  Not that

12   I'm aware of.

13   Q    Okay.

14   A    He's tried to flee or not.

15   Q    He hasn't fled, right?

16   A    Correct.

17   Q    Okay.

18       **(Pause in the proceeding.)**

19   **BY MR. BIRES:**

20   Q    And you have indicated in your proffer that he has

21   connections to the Jalisco New Generation Cartel.

22   A    Yes.

23   Q    Is that right?

24   A    Yes.

25       **(Pause in the proceeding.)**

1  **BY MR. BIRES:**

2  Q    Is that based upon him having talked with someone who is

3  associated with that group?

4  A    Based on who he would get his cocaine from.

5  Q    Okay.  And -- and --

6       **(Pause in the proceeding.)**

7  **BY MR. BIRES:**

8  Q    All right.

9       **(Pause in the proceeding.)**

10 **BY MR. BIRES:**

11 Q    So it's not based on any surveillance that puts him in

12 direct contact with anybody that you believe is high up in the

13 Jalisco New Generation Cartel, right?

14 A    The higher up individual was C.J. Guirome (phonetic) in

15 Mexico.  So, correct, no -- no he's not.

16 Q    Okay.

17      **(Pause in the proceeding.)**

18      **MR. BIRES:**  I don't have any further questions of

19 this witness.

20      **THE COURT:**  Thank you, Mr. Bires.  Mr. Cusick,

21 anything further with Agent Emerson?

22      **MR. CUSICK:**  Yes, your Honor.

23      First of all, I'd like, if I could, get my proffer

24 notes back.

25      **MR. BIRES:**  Oh.  Sure.

 1          **THE COURT:**  We can arrange for that.

 2       **(Pause in the proceeding.)**

 3                       **REDIRECT EXAMINATION**

 4    **BY MR. CUSICK:**

 5    Q    Agent Emerson, you were asked earlier about the substances

 6    involved with this alleged drug conspiracy in Count One,

 7    cocaine, heroin, fentanyl, but also number four is

 8    methamphetamine.

 9    A    Yes.

10    Q    You talked about that there were just three earlier, but

11    there were actually four.

12    A    Correct.

13    Q    And that is included in the indictment.

14    A    Yes, sir.

15       **(Pause in the proceeding.)**

16    **BY MR. CUSICK:**

17    Q    There was a lot of talk about Michael Ryan Barajas.

18             In your investigation of Mr. Villarreal-Martinez, how

19    many different people did he talk with in the context of this

20    drug conspiracy during the investigation?

21    A    He had numerous customers that he supplied.  Again, going

22    off memory and, you know, I can't recall every single one.  But

23    if you wanted a round about number, probably between five and

24    ten were just regular customers.

25    Q    And so there was not some small circle of four or people

1    that if he was involved with drugs, Mr. Villarreal-Martinez

2    would be involved with all of those people on each occasion.

3    A    No, sir.

4         In, you know, the customers weren't just locally.  It

5    was, you know, Florida, Nashville, Tennessee, other locations.

6    Q    And based on your recitation, you said earlier he

7    had -- did he have multiple sources of supply in Mexico?

8    A    Yes, sir.

9    Q    Did he have -- how many people would you consider his

10   subordinates in the transportation of -- into the stashing,

11   couriers?

12   A    I would say definitely Ovidio Martinez, to an extent

13   Carlos Gutierrez until he kind of split off and -- and did his

14   own thing.  Rafael Montemayor, he would serve as both a

15   courier, but also he ran the -- one of the stash houses for

16   Mr. Villarreal.  And Manuel Castillo-Reyes, he ran one of the

17   stash houses for Mr. Villarreal in Humble, Texas.

18   Q    All right.  And so like am I -- four or five people?

19   A    Correct.

20        **(Pause in the proceeding.)**

21   **BY MR. CUSICK:**

22   Q    You said earlier you'd skimmed the Pretrial Services

23   Report and there isn't that much detail.

24        But with reference to the McAllen Division of

25   Pretrial referring that Mr. Villarreal-Martinez had been

1   compliant with the conditions of his supervised release.  Did

2   you -- did you notice what date that -- that information was

3   put into the report?

4   A    No, sir.

5            **THE COURT:**  I get it.

6   **BY MR. CUSICK:**

7   Q    And what day was it that you discovered the cocaine and

8   marijuana in Mr. Villarreal-Martinez' residence?

9   A    It was only the cocaine.  It was March 26th, 2024.

10           **(Pause in the proceeding.)**

11           **THE COURT:**  Just so we're all clear, I mean,

12  it -- Pretrial says they're not aware of any violations.  If he

13  did, in fact, have cocaine in his possession on March 26th,

14  that's a clear violation of Pretrial -- of -- of that

15  condition.

16           So, I -- I -- I get it.

17           **(Pause in the proceeding.)**

18           **MR. CUSICK:**  I have no further questions, Judge.

19           **THE COURT:**  Okay.  Thank you very much.

20           Anything further, Mr. Bires?

21           **MR. BIRES:**  Just one second.

22           **(Pause in the proceeding.)**

23                      **RECROSS EXAMINATION**

24  **BY MR. BIRES:**

25  Q    Mr. Cusick just asked you a question about

1   methamphetamine.  I thought I had referred to that earlier.

2   But the fact of the matter is as far as substantive counts in

3   this indictment go, Mr. Villarreal is not charged with any

4   substantive counts involving methamphetamine, right?

5   A    Correct.  Yes, sir.

6   Q    Okay.  In maybe -- maybe I didn't understand.  But --

7          **THE COURT:**  I think I -- I think I'm the one that

8   said I listed very -- when I was trying to inquire into what it

9   was, I think I mentioned various things.  And I did not mention

10  methamphetamine, which was not an intentional omission.  So I

11  don't think it was you that made the mistake.  I think it was

12  me that made the mistake.

13         **MR. BIRES:**  I -- I don't think you made a mistake.

14         **THE COURT:**  Okay.  Good.

15         But -- but I did -- what -- what your point is well

16  taken.

17         **MR. BIRES:**  Yes.

18         **THE COURT:**  There are not substantive counts against

19  this Defendant other than -- well --

20         **THE WITNESS:**  Cocaine.

21         **THE COURT:**  -- other than cocaine.

22         **MR. BIRES:**  That's right.

23  **BY MR. BIRES:**

24  Q    Perhaps I misunderstood.  But it seemed to me that

25  Mr. Cusick was trying to -- when he asked you the question

1   about the number of people that Mr. Villarreal was involved

2   with, to me it was that there was a great number of people that

3   he was involved with, and not just four or five people.

4           But your testimony is there were four or five people

5   that he was involved with; is that right?

6   A    No, sir.  His question didn't ask me who he was involved

7   with.  His question asked me who were his subordinates.  Who

8   did Mr. Villarreal direct and coordinate to make the deliveries

9   on his direction.

10  Q    Okay.

11  A    Not involved with, but who were his subordinates was the

12  question.  That's how I understood it at least.

13  Q    Okay.

14       **(Pause in the proceeding.)**

15  **BY MR. BIRES:**

16  Q    Four or five people you say.

17  A    Subordinates, yes, sir.

18  Q    All right.

19       **(Pause in the proceeding.)**

20       **MR. BIRES:**  That's all I have.

21       **THE COURT:**  Okay.  Mr. Cusick, anything further?

22       **MR. CUSICK:**  No, your Honor.

23       **THE COURT:**  Agent Emerson, you may step down from the

24  witness stand.

25       **THE WITNESS:**  Thank you.

1   **THE COURT:** I'm so used to saying proverbial witness

2  stand, but actually this is the real witness stand. So thank

3  you very much.

4      **(Witness steps down.)**

5      **THE COURT:** Mr. Cusick, any further evidence,

6  witnesses, testimony in the Government's case?

7          **MR. CUSICK:** No, your Honor.

8      **THE COURT:** Anything from the defense?

9          **MR. BIRES:** Yes, your Honor.

10     **(Pause in the proceeding.)**

11         **MR. BIRES:** I'm going to call Gilberto Villarreal.

12  He's present here in the courtroom.

13     **THE COURT:** Okay. If you'd come forward, please.

14     **(Pause in the proceeding.)**

15     **THE COURT:** Come up to the witness stand. We'll have

16  our topnotch interpreter stand next to you.

17          Could you spell your full name, sir.

18     **THE WITNESS:** Villarreal, spell?

19     **THE COURT:** Yes.

20     **THE WITNESS:** It's G-i-l-e-r-t-o -- r-t-o. V-e

21  double l-a double rr-e-a-l. And Martinez.

22     **THE COURT:** Okay.

23          Mr. Villarreal-Martinez, do me a favor. Raise your

24  right hand, sir.

25     **(Defendant sworn)**

1          **THE WITNESS:**  Yes, that's right.

2          **THE COURT:**  Okay.  We have an interpreter who's

3   obviously translating everything that I say instantaneously

4   from English to Spanish.  And if you say anything, from Spanish

5   to English.

6          Just let me finish answering -- asking my question

7   before you say anything.  And I'll make sure I fully allow the

8   interpreter to translate everything before I say anything.

9          Okay, sir?

10          **THE WITNESS:**  Okay.

11       **(Pause in the proceeding.)**

12          **THE COURT:**  Please proceed.

13                      **DIRECT EXAMINATION**

14   **BY MR. BIRES:**

15   Q   Mr. Gilberto Villarreal, what is your relationship to

16   Gerardo Villarreal.

17   A   He's my brother.

18   Q   And where do you live?

19   A   I live in Pharr, Texas.  Do you need the address or

20   just --

21   Q   No.  No.  Do you have family that lives in Pharr, Texas?

22   A   Yes.  Well my family, my wife, and -- and my family and my

23   kids.

24   Q   Okay.  How many kids do you have?

25   A   Two children.  A boy and a girl.

1    Q    And what kind of work do you do?

2    A    I work as an -- I'm an electrician.  The industrial type.

3    Q    And where do you currently work?

4    A    Right now I'm working in a small town called Taylor

5    (phonetic).  It's about -- it's about 40 minutes from Austin.

6    Q    And what is the name of the business that you are working

7    at?

8    A    It's called Samsung.  It's a Samsung plant.

9    Q    Is that the semiconductor plant in Tyler, Texas?

10   A    Yeah.  I've got right here if -- if you want to see.

11   Q    Is that the semiconductor plant in Tyler, Texas?

12   A    Yes.

13   Q    All right.  And are you -- because you're working in

14   Tyler, Texas, which is very near Austin, are you also staying

15   in that area right now?

16   A    Yes.  I'm staying in some apartments in Manor -- Manor,

17   Texas.

18   Q    How long have you been an industrial electrician?

19   A    Since 2014.

20   Q    How long have you worked at this Samsung semiconductor

21   facility?

22   A    It has just been six months on the 28th of this last

23   month.

24   Q    Okay.

25        **(Pause in the proceeding.)**

1  **BY MR. BIRES:**

2  Q    Do you have an opinion or in your opinion, is your

3  brother, Gerardo Villarreal, a flight risk.  Meaning, that if

4  he is released on bond, he'll run away.

5       **(Pause in the proceeding.)**

6            **THE WITNESS:**  No.  I don't think so.

7            He's been there two years now already.  He's a good

8  person.  I mean, he's never harmed anyone, right?

9  **BY MR. BIRES:**

10 Q    Okay.  Now when you say he's been there two years now, you

11 mean while he's been on supervised release?

12 A    Yes.  I mean, he was in at home without being able to

13 leave for two years.

14 Q    Okay.  So he didn't try to leave, right?

15 A    No.  No.  He doesn't use drugs.  He doesn't drink.

16 Q    Okay.

17      **(Pause in the proceeding.)**

18 **BY MR. BIRES:**

19 Q    The Government's position is that your brother is a danger

20 to the community.  Have you ever known your brother to be a

21 violent or aggressive person?

22 A    Never.  Not even as a kid.  I was the one that used to hit

23 him.

24 Q    Okay.  In your opinion, is your brother, Gerardo

25 Villarreal, a danger to the community or to anybody in the

1  community?

2  A    Let's see.  Could you repeat that for me?

3  Q    In your opinion is your brother, Gerardo, a danger to the

4  community or anybody in the community?

5  A    No.  I'm 100 percent sure he's not.

6         **MR. BIRES:**  I don't have any further questions of

7  this witness.

8         **THE COURT:**  Okay.  Thank you very much.

9         Mr. Cusick.

10        **MR. CUSICK:**  Thank you, your Honor.

11        **THE COURT:**  Yes.

12                      **CROSS EXAMINATION**

13  **BY MR. CUSICK:**

14  Q    How often do you see your brother?

15  A    Well, I'm working, sir.

16  Q    So that means you haven't seen him in the last two years?

17  A    No, of course.  When he was over there.  I worked for a

18  time.  I worked for a time.  And when there's a chance, I'd

19  seen him, we'd hang out, we'd talk.  That's all.

20        **MR. CUSICK:**  No further questions, your Honor.

21        **MR. BIRES:**  One more.

22        **THE COURT:**  Anything further?

23        **MR. BIRES:**  Yes.  One more, please.

24        **THE COURT:**  Sure.

25  //

1                    **REDIRECT EXAMINATION**

2  **BY MR. BIRES:**

3  Q    What kind of work does your brother do?

4  A    He had -- we had set up a trucking company.

5  Q    Do you have any ownership interest in that trucking

6  company?

7  A    Yes, we're in it 50/50.

8  Q    All right.  And how long have you had that trucking

9  company?

10 A    About a year and a half, I think, more or less.

11            **MR. BIRES:**  All right.  Pass the witness.

12            **THE COURT:**  Anything further?

13            **MR. CUSICK:**  A couple questions, your Honor.

14                    **RECROSS EXAMINATION**

15 **BY MR. CUSICK:**

16 Q    What's the name of that company?

17 A    Like Rarb, like R-a-r-b.

18      **(Pause in the proceeding.)**

19            **THE WITNESS:**  And capital B.

20      **(Pause in the proceeding.)**

21 **BY MR. CUSICK:**

22 Q    And were you aware your brother sold that company?

23 A    I knew that he had stopped because the drivers had left

24 and he had told me he would sell the trucks.  And well, he sold

25 the trucks.  One of the trucks was mine.

1          **MR. CUSICK:**  No further questions, your Honor.

2          **THE COURT:**  Anything further?

3                          **REDIRECT EXAMINATION**

4   **BY MR. BIRES:**

5   Q    How much money did he get for the sale of any of those

6   trucks?

7   A    Well, for one by itself, more or less, they cost around

8   $30,000, 25,000, $30,000 per truck.

9   Q    And there were how many trucks?

10  A    We had as many as three at one time.  But one of

11  them -- one was completely mine.

12  Q    Okay.

13         **(Pause in the proceeding.)**

14         **MR. BIRES:**  That's all the questions I have, Judge.

15         **THE COURT:**  Okay.  Anything further, Mr. Cusick?

16         **MR. CUSICK:**  No, your Honor.

17         **THE COURT:**  Thank you very much, sir.  You may step

18  down from the witness stand.

19         **(Witness steps down.)**

20         **THE COURT:**  Anything further for the Defendant?

21         **MR. BIRES:**  I have.  Not from this witness.  I have

22  one other -- one other witness, your Honor.

23         **THE COURT:**  Okay.  Who is the --

24         **MR. BIRES:**  And she's --

25         **THE COURT:**  -- witness?

1          **MR. BIRES:**  She's on Zoom.  It's Jisella Ortiz.

2          **THE COURT:**  And how do you spell that name?

3          **MR. BIRES:**  J-i-s-e-l-l-a, Ortiz, O-r --

4          **THE COURT:**  Okay.  Miss Ortiz, can you hear me loud

5    and clear?

6          **THE WITNESS:**  Yes, I can hear you, your Honor.

7          **THE COURT:**  Okay.  Would you do me a favor.  Would

8    you please raise your right hand.

9          **(Witness sworn.)**

10         **THE COURT:**  Okay.  Mr. Bires, I'll let you proceed.

11         **MR. BIRES:**  Thank you, Judge.

12                          **DIRECT EXAMINATION**

13   **BY MR. BIRES:**

14   Q    Miss Ortiz, how do you know Gerardo Villarreal?

15   A    He is my ex-boyfriend.

16   Q    And when you say he's your ex-boyfriend, when -- when did

17   your relationship with him end?

18   A    November of 2023.

19   Q    But you're here to testify on his behalf today; is that

20   correct?

21   A    Yes, I am.

22   Q    All right.  Would you tell the Judge a little bit about

23   yourself.  Where do you live?  You don't need to give the

24   street address, but just where do you live?

25   A    Yes, I currently live in McAllen, Texas.  I've known Gerry

1   (phonetic) for eight years already.

2          I know it sounds pretty weird that I'm the ex-

3   girlfriend and I'm still helping him.  Of course, I would.  And

4   I would do it any day because he was my boyfriend, right?

5          I've been doing real estate for seven years.  I

6   do -- I do a lot of investments.  I do a lot of -- I have a

7   brokers' license.  I currently have a brokerage.

8          And I've known Gerry both seven or eight years.  So

9   will come here to testify and any -- answer any questions.

10  Q    All right.

11         So do you believe that he is a flight risk.  That is,

12  that if the Court sets conditions of release, bond, that

13  he'd -- that he would take off, that he'll run away?

14  A    No.  I absolutely do not.

15  Q    Okay.  In your opinion, is he a danger to the community?

16  A    No, sir.  He is not.

17  Q    In your opinion, is he a danger to any individual in the

18  community?

19  A    No, he is not.

20         **MR. BIRES:**  Pass the witness.

21         **THE COURT:**  Anything further, Mr. -- well, not

22  anything further.  Anything at all, Mr. Cusick.

23         **MR. CUSICK:**  A few questions, your Honor.

24         **THE COURT:**  Sure.

25         **(Pause in the proceeding.)**

**CROSS EXAMINATION**

**BY MR. CUSICK:**

Q    So for the time you've known Gerardo Villarreal Martinez, what have you known him to do for work?

A    He has a company that -- he has a trucking company.  I would help him get, obviously, drivers for him.  He -- before that he used to sell cars.  He had like a -- like salvage cars, and a couple of auctions that he sold to.

But, yes, he was currently doing truck -- he had a trucking company.

Q    And  does he still have it -- you've listened to the previous testimony.

Does he -- do you know that he still has the company or do you know that he sold the company?

A    He -- I don't -- I'm not aware of that.  I know he was still active, because I helped him buy several parts.  But if -- he had a -- he had a hard time with the drivers.

So he has to continuously hire new ones.

Q    Well when was the last time you -- you've spoken to Mr. Villarreal-Martinez about locating drivers or anything to do with the trucking company?

A    Last year.

Q    Okay.

**MR. CUSICK:**  No further questions, your Honor.

**THE COURT:**  Anything further?

1        **MR. BIRES:**  I don't have any further questions.

2        **THE COURT:**  Thank you very much, Miss Ortiz.

3   Appreciate your testimony.  You may step down from the

4   proverbial witness stand.  So feel free to stay on or get off,

5   either way.

6        **(Witness steps down.)**

7        **THE COURT:**  Anything further, Mr. Bires?

8        **MR. BIRES:**  No, your Honor.  We rest.

9        **THE COURT:**  Okay.  Let's have argument.  Mr. Cusick.

10       **MR. CUSICK:**  Well, your Honor, the Government's

11  position is this Defendant is a risk of flight and a danger to

12  the community.

13       He's got extensive contacts with the drug trafficking

14  organization.  For --

15       **THE COURT:**  Actually, before you -- I have one more

16  question.  Actually I forgot to ask Agent Emerson.

17       **MR. CUSICK:**  Yes, sir.

18       **THE COURT:**  Let me do that.

19       So you're still under oath, Agent Emerson.

20       **THE WITNESS:**  Yes, sir.

21       **THE COURT:**  What's the -- the street value's not

22  the -- I'm not sure that's the right word.  What's the value of

23  a kilogram of cocaine in the Houston, Texas area?

24       **THE WITNESS:**  For -- at this current day?

25       **THE COURT:**  Correct.

1          THE WITNESS:  Cause it changes.

2          THE COURT:  Roughly.

3          THE WITNESS:  Eleven to twelve thousand per kilogram.

4          THE COURT:  Okay.  Okay.  That's all I wanted to

5    know.

6          Okay.  Mr. Cusick, sorry about that.

7       **(Pause in the proceeding.)**

8          MR. CUSICK:  And, your Honor, I would argue

9    that -- or could I ask Agent Emerson one more question on

10   following up what you said?

11         THE COURT:  Sure.  And I'll allow Mr. Bires if

12   there's anything to ask as well.

13                  **REDIRECT EXAMINATION**

14   **BY MR. CUSICK:**

15   Q    During the investigation, what was the price of a kilogram

16   of cocaine?

17   A    It -- it really fluctuated, because this was right in the

18   middle of Covid.

19         It -- it started around 24,000, 23,000.  And then

20   when Covid hit, it -- it jumped up to 30,000 per kilogram.

21         THE COURT:  Anything further on this issue,

22   Mr. Bires?

23         MR. BIRES:  No, your Honor.

24         THE COURT:  Okay.  All right.  Now let's have closing

25   arguments.  Sorry about that, Mr. Cusick.

1      **MR. CUSICK:**  That's all right.

2          Your Honor, for the reasons I've stated at the

3   beginning, but based on the -- the testimony of -- of Agent

4   Emerson, the facts of the case, and also what's in the Pretrial

5   Services Report, it's the Government's belief he is a risk of

6   flight.  He's a danger to the community.

7          The Government doesn't care what anybody says about

8   drugs and firearms are not inherently violent.  Selling them so

9   that they can feed and have that ruin somebody life, or a gun

10  could be used in a violent way, and somebody -- that's part of

11  the violence of those two types of crimes.

12         And so, in the sense that he may have only been

13  dealing in drugs, and -- and firearms according to

14  prior -- Pretrial Services Report, he's involved in a

15  violent -- violent activities.

16         And the Government believes with his contacts, with

17  the sources of supply, the Cartel itself, CJNG, in Mexico, he's

18  got his own subordinates that -- that carry out his -- his

19  tasks, such as storing drugs, transporting drugs, picking up

20  money and bringing money back.  And he has his own customers

21  who buy the drugs, from which he gets the money.

22         The Government believes he is a danger to the

23  community.  And if he's released, he'll continue to do it.

24         The proof in the pudding is he's been on supervised

25  release since May of 2022, and according to the McAllen

1  Pretrial Services officer, he's a stellar releasee, because

2  he's paid his fines, or whatever, and there's nothing wrong.

3         But then on March the 26th, and a search warrant is

4  run at his house, he has 6 kilograms of cocaine.

5         **(Pause in the proceeding.)**

6         **MR. CUSICK:**  Obviously, Pretrial Services didn't know

7  about that.  Because this opinion was on the -- they rendered

8  was on March 27th.  And the drugs are discovered on March 26th.

9         But that in itself proves that while it seems so non-

10 violent that he could be released on bond, he'll do what he's

11 supposed to do.  He didn't do it.  And this was under Court

12 supervision.

13        **(Pause in the proceeding.)**

14        **MR. CUSICK:**  So the Government's belief that he is a

15 danger to the community is based on that.

16        Risk of flight.  He has his mother, sister lives in

17 Mexico.  He went to undergraduate degree and a law degree in

18 Mexico.  He can freely matriculate through both countries if he

19 wants to, cause he's fluent in English, Spanish.  He has family

20 members on both sides.  He has contacts in Mexico through the

21 drug trade.

22        **(Pause in the proceeding.)**

23        **MR. CUSICK:**  To think that he, if he wanted to, he

24 could take off.  And just because he's been around for the last

25 couple of years for supervised release, the Government's not

1    impressed.

2          Because he may not have taken flight.  He just

3    continued in business, continued his dangerousness to the

4    community.  Therefore, the Government believes that releasing

5    him on bond, you can bet he will continue to do business.

6          Because he sells his trucking company and he has

7    no -- no employment in the last few months, according to the

8    Pretrial Services Report.  Yet, he has $5320 a month in monthly

9    living expenses, but no means to make an income to pay for

10   that.

11         So the Government believes all the incentive is there

12   for him.  He will not -- even if he didn't take flight, that

13   he'll continue in the drug trade.  And worse yet, he could take

14   off and then we got -- we could never get to the point where

15   can the Government bring it -- finish its case against him in

16   the Court system.

17         So the Government believes for both reasons he should

18   be detained pending trial.

19         **THE COURT:**  Okay.  Thank you very much.  Mr. Bires?

20         **MR. BIRES:**  Judge, just one of the things I wanted to

21   refer to is that this seizure that occurred on March 26th was

22   the day before the Pretrial Services Report was offered.  That

23   would certainly be something that they could have been aware

24   of.  But --

25         **THE COURT:**  But -- but -- but this is a tempest in a

1  teapot.

2       **MR. BIRES:**  Right.

3       **THE COURT:**  If he was caught with six kilograms of

4  cocaine, it's clearly not in compliance with previous -- with

5  the terms of his supervised release.

6       **MR. BIRES:**  That's true.

7       **THE COURT:**  Okay.

8       **MR. BIRES:**  All right.

9       **THE COURT:**  I interrupted you.  So maybe you were

10  going to say something else.  I might cut you off.  Sorry about

11  that.

12       **MR. BIRES:**  The $60,000 or so that was seized you've

13  already heard his brother's testimony.

14       They owned three trucks.  And each truck is worth

15  about $30,000.  So that would explain where he would have

16  acquired cash and had the ability to live if he sold his

17  business somewhat prior to, or shortly before, his arrest.

18  That would account for that.

19       You know, six kilograms of cocaine, well that's a big

20  problem for us.  Because it's -- it is clearly contraband.  And

21  we acknowledge that.  I'm not going to sit here and pretend

22  that -- that it's not.

23       He has -- he is an American citizen.  He has lived in

24  the United States basically his entire life.  He has lived in

25  the same community basically his entire life, Pharr, Hidalgo,

1  McAllen.  They're all down there in a cluster near the border.

2       That he's made no opportunity, excuse me, he has

3  never tried to flee the jurisdiction of the United States.  And

4  obviously, according to the Government, has plenty of

5  opportunity to do that.  But he went to court in McAllen.  He's

6  going to court here.  Of course, he's in custody here.  But he

7  showed up in McAllen in front of Judge Hinojosa, who gave him

8  time served and -- and a three-year term of supervised release

9  on false statement by a co-Defendant on a Form 4473 having to

10  do with the purchase of a firearm.

11       **(Pause in the proceeding.)**

12       **MR. BIRES:**  But, Mr. Villarreal certainly had the

13  opportunity to take off and go to Mexico when that case was

14  pending.  And while he was pending sentencing, and he was out

15  on bond, during the pendency of that case, and showed up in

16  court like he was supposed to.

17       And you've heard from his brother and you've heard --

18       **THE COURT:**  I'm with you on risk of flight.  Talk to

19  me about danger to the community.  I'm with you on risk of

20  flight.

21       **MR. BIRES:**  Okay.

22       **THE COURT:**  Talk to me on danger to the community.

23       **MR. BIRES:**  The -- the biggest problem that we've got

24  is the six kilos of cocaine that was found at his apartment

25  when he was arrested.  And I -- I acknowledge that.

1        He can comply with whatever conditions, or set of

2   conditions, this Court imposes as conditions of release.  He is

3   presumed to be innocent.  And it facilitates his ability to

4   defend himself if he is released on bond.

5        Otherwise, this lawyer standing in front of you gets

6   to take another trip out to Joe Corley like I did yesterday,

7   which is not a great place to go.  But --

8            **THE COURT:**  But that -- that's true in every case,

9   right?

10           **MR. BIRES:**  Well, that's true.

11           **THE COURT:**  I mean, obviously, if a Defendant is

12  released pending trial, it facilitates a better relationship,

13  better communication, and, I mean, --

14       **(Telephonic announcement.)**

15           **THE COURT:**  I'm sure that -- I mean, let's call a

16  spade a spade.  I --

17       **(Telephonic announcement.)**

18           **THE COURT:**  Detention is the exception rather than

19  the rule.  It should be an exceptional step.  It should be used

20  very rarely.

21       I mean, the argument I'm hearing from the Government

22  is hey, he was on supervised release from this firearm charge.

23  He's on supervised release, so he's got to comply with

24  restrictions.  He didn't do it.

25           Put aside for a second the six kilograms, which is

1    over, you know, 60, $70,000 on March 26th.  But in addition,

2    the testimony from Agent Emerson is, in April of '23 and March,

3    '24, he's directing supervised transportation of cocaine after

4    he's already been convicted of the firearms charge.  So he's on

5    supervised release.

6         How does that give me any confidence, just very

7    directly, that he'd comply with any restrictions that I impose?

8         **(Pause in the proceeding.)**

9         **MR. BIRES:**  He has a lot to lose by not complying

10   with conditions of release.  His ability to remain on bond and

11   defend himself in this case is facilitated by his release.

12        And as you said, you know, just about anybody's in

13   that position.  But the way the Government is describing

14   Mr. Villarreal, he's this guy with all these major connections

15   to the Jalisco New Generation Cartel.

16        But, he doesn't live that kind of a life.  He

17   doesn't -- he's not ostentatious.  He's -- shows up in court

18   when he's supposed to.  He had every opportunity to leave when

19   that gun case was pending at -- down in McAllen.

20        And there was no guarantee that he wouldn't be

21   sentenced to prison then.  And he showed up in court like he

22   was supposed to.

23        **THE COURT:**  I'm with you.  I -- I agree with you on

24   the risk of flight.  I don't think he's a risk of flight.  I do

25   not think he's a risk of flight.

1      Why isn't he a danger to the community that he's

2  running drugs, he's involved in this operation where he's

3  pulling the strings, and he's helping direct and supervise the

4  transportation of methamphetamines, cocaine, heroin, fentanyl,

5  all these drugs we've discussed?

6      **MR. BIRES:**  And -- and -- and, Judge, this multi-

7  object conspiracy that is charged in Count One, where they're

8  talking about fentanyl, cocaine, methamphetamine, and heroin,

9  the only drug that they have connected to him to in terms of

10  what he's charged with in this indictment, and the testimony

11  that you heard from this agent, is cocaine.

12      He's not involved in fentanyl, heroin, or

13  methamphetamine.  Not based on --

14      **THE COURT:**  Let's assume that's true.  Okay.  So

15  what?  It's cocaine.

16      **MR. BIRES:**  True.  Now --

17      **THE COURT:**  Even if true, I mean, isn't it a danger

18  to the community if someone is out there pulling the strings,

19  transporting, delivering, arranging for sales of cocaine all

20  across the state  of Texas?

21      **MR. BIRES:**  Could be.  Could be.  But you've heard

22  the testimony of -- of his ex-girlfriend and his brother that

23  he's not a danger.  And the ex-girlfriend is here to testify.

24  She doesn't owe him anything at this time.  She's just here to

25  tell you what she knows about him, that he's not a danger to

1  the community.

2          And the same with his brother.  And his brother,

3  basically, offers an explanation to you with regards to where

4  the money that was seized came from.

5          **THE COURT:**  So I'm not actually worried about that

6  money.

7          **MR. BIRES:**  So --

8          **THE COURT:**  So I'm with you on that.

9          **MR. BIRES:**  So, okay.

10         **THE COURT:**  Okay.  I got you.

11         **MR. BIRES:**  Uh --

12      **(Pause in the proceeding.)**

13         **MR. BIRES:**  We're going to rely on the presumption of

14  innocence.  We have not seen or heard from any witnesses

15  besides this agent, who is depending on the hearsay, that

16  Mr. Villarreal directs anybody.

17         That's all I have to say.  I think he's not a flight

18  risk.  I don't think they've proven that he is a flight risk or

19  a danger to the community, in spite of the fact that six

20  kilograms of cocaine were seized at the time of his arrest.

21         **THE COURT:**  Gotcha.  Okay.  Mr. Cusick, any last

22  words?

23         **MR. CUSICK:**  No, your Honor.

24         **THE COURT:**  Okay.  Thank you both very much.  I

25  really appreciate both the presentation of evidence and the

1  argument today.

2      Obviously, we're here today on the Government's

3  request that Mr. Villarreal-Martinez be held in custody pending

4  the trial of this case.  And as you both are well aware, but I

5  want to make sure it's clear for the record, I am guided by

6  several sort of overriding principles.

7      First and foremost, as Mr. Bires has pointed out, his

8  client Mr. Villarreal-Martinez is entitled to a presumption of

9  innocence.  Nothing that takes place in this hearing, nothing

10  that I say in any written findings is intended in any way,

11  shape, or form to affect that presumption.

12      The only purpose of this hearing today is to

13  determine whether or not Mr. Villarreal-Martinez should be held

14  in custody pending the trial of this case.

15      The second overriding principle is that under the

16  Bail Reform Act, as I mentioned earlier, detention is the

17  exception rather than the rule.  It is a truly exceptional

18  step.  And under the Bail Reform Act, a Defendant must be

19  released pending trial unless I find that the Defendant is

20  a -- a -- unless I find that there are no, none conditions, or

21  combination of conditions, that exist that will either

22  reasonably assure the appearance of the Defendant or reasonably

23  assure the safety of any person in the community.

24      In this case, the Government, as Mr. Cusick

25  explained, is seeking detention, both on the risk of flight and

1  the danger to the community.

2  Let me start off.  This is a presumption case.  I do

3  think the presumption has been rebutted.  So the question then

4  becomes on the risk of flight, the Government has to show by a

5  preponderance of the evidence that there are no conditions, or

6  combination of conditions, that would reasonably assure the

7  Defendant's presence as required.

8  Let me start with that, as I have sort of indicated.

9  **(Pause in the proceeding.)**

10  **THE COURT:**  The Defendant has lived in the United

11  States for a long, long period of time.  Yes, he has

12  connections in Mexico.  But I just think -- I think there are

13  conditions that I could impose that would alleviate the risk of

14  flight.  And I do not think he's a risk of flight, especially

15  given how long he has been here.

16  So then we turn to the danger to the community issue.

17  The burden is actually higher on the Government in that case.

18  The Government has to show by clear and convincing evidence

19  that no conditions, or combination of conditions, will

20  reasonably assure the safety of the community.

21  And the question is, has the Government met that

22  burden.  I think the Government has.  The -- the Defendant

23  has -- look, Defendant was on a firearms charge.  Pled guilty.

24  Despite that, the evidence is that in April, '23,

25  March of 2024, that the Defendant was directing, supervising

1  cocaine deliveries.  And then, you know, the fact that he's

2  found on March 26th with 6 kilograms, over $60,000 of cocaine

3  in the residence, his residence, and his residence solely, is

4  greatly concerning to me.

5         Although it's true he might not, you know -- I don't

6  have a situation where I could say he fired a weapon.  I think

7  the transporting and being involved in the delivery and

8  transportation of cocaine, put aside the other drugs that have

9  been mentioned.  It does represent a sincere and significant

10  danger to the community.

11        The question then becomes, are there any conditions

12  that I could impose to alleviate the risk.  And I always want

13  to.  I always try to impose conditions.

14        I have no confidence that anything I could do here

15  would alleviate the risk.  The Defendant has been on supervised

16  release.  Despite that, apparently, from the testimony I've

17  given, he hasn't complied with those requirements.  And I've no

18  reason to believe that there's any condition that I could

19  impose that would cause him to comply with the law.

20        So as a result, I think the Government has satisfied

21  its burden to show by clear and convincing evidence that

22  Mr. Villarreal-Martinez is a danger to the community.  And

23  there are no condition, or combination of conditions, that I

24  could impose to alleviate that threat.

25        As a result, I'm going to order Mr. Villarreal-

1  Martinez detained pending trial of this case.  And I'll issue a

2  written order to that effect later today with some further

3  analysis in laying out my explanation.

4          With all that said and done, anything further from

5  the Government, Mr. Cusick?

6          **MR. CUSICK:**  Not on this Defendant, your Honor.

7          **THE COURT:**  And Mr. Bires?

8          **MR. BIRES:**  I have nothing further at this time.

9          **THE COURT:**  Okay.  Thank you both very much.  Once

10 again, I appreciate it.

11         Mr. Villarreal-Martinez, I remand you to custody of

12 the United States Marshals.  Have a good day, sir.  Take care.

13         And we're off the record.

14     **(This proceeding was adjourned at 12:35 p.m.)**

15

16                          CERTIFICATION

17

18 I certify that the foregoing is a correct transcript from the

19 electronic sound recording of the proceedings in the above-

20 entitled matter.

21     _/s/ Cheryl L. Battaglia_            _____April 12, 2024_____

22          Transcriber                              Date

23 2:23-CR-029

24 04/03/24 - 04/12/24